CLEVELAND, C., O. & ST. L. RY. CO. v. BROWN.

(Circuit Court of Appeals, Seventh Circuit. February 18, 1893.)

No. 72.

1. MASTER AND SERVANT—FELLOW SERVANT—FOREMAN OF GANG.
    The foreman of a gang of 20 railroad laborers, who hires and discharges the men under him, keeps their time, and directs and controls their movements, is not their fellow-servant.

2. SAME—NEGLIGENCE OF MASTER—EVIDENCE.
    A gang of seven or eight railroad laborers was put to work tearing down a heavy shed, 60 to 70 feet long, by sawing it asunder in the middle, cutting off the supporting posts, and then pushing it over in a direction against the wind. The only tools furnished for the work were four axes, one saw, one crowbar, one pinchbar, hammers, a maul, and two pieces of unsound plank, picked up for the occasion. The shed fell in the wrong direction, and injured one of the laborers. *Held*, that the evidence justified a verdict finding the company guilty of negligence.

3. SAME—CONTRIBUTORY NEGLIGENCE—EVIDENCE.
    The laborer who was injured had been on the roof of the shed sawing the roof, and, when he finished the sawing, he was directed by the foreman to come down and chop one of the posts. After he had struck a few blows, the shed fell and caught him. He did not know that while he was on the roof the other men had cut the other posts. *Held*, that the jury were justified in finding that he was not guilty of contributory negligence.

4. MEASURE OF DAMAGES FOR PERSONAL INJURIES.
    Seventy-five hundred dollars is not excessive damages for injuring a railroad laborer so that he becomes paralytic.

In Error to the Circuit Court of the United States for the Southern District of Illinois.

Action on the case brought by Millard F. Brown against the Cleveland, Cincinnati, Chicago & St. Louis Railway Company for personal injuries. Plaintiff obtained judgment. Defendant brings error. Affirmed.

John M. Lansden, for plaintiff in error.
Boyer & Butler, for defendant in error.

Before GRESHAM and WOODS, Circuit Judges, and BUNN, District Judge.

BUNN, District Judge. This is an action for damages sustained by the defendant in error on account of an injury to his person received while in the employ of the plaintiff in error, caused by the falling of a shed, which he, together with several other employes of the railroad company, was engaged in taking down. The usual questions regarding the negligence of the company and contributory negligence on the part of the person sustaining the injury are the ones that were in issue in the court below, and the ones which have been presented for review by this court. These, with one exception, are questions of fact, and we think were fairly submitted to, and determined by, the jury. There was a verdict in favor of the plaintiff below for $7,500, which we think the court

properly refused to set aside. The evidence shows that when the accident happened, on November 18, 1889, the railroad company had in its employ one Patrick Scullen, as boss or foreman of a gang of some 20 men, employed in various work for the company, such as driving piles and building trestle work, laying ties, building and tearing down sheds, etc. Scullen hired and discharged the men under him, kept their time, and directed and controlled all their movements. Brown, the plaintiff below, was one of this gang of men, known, as he says, as the "bridge gang," and had been so from about the 15th of October of that year. They had, immediately preceding the time of this accident, been engaged in the construction of trestle work and a shed at Cairo. On November 18th, Scullen set to work, with seven or eight men under him, to take down a shed at North Cairo, standing between two tracks, which the company had used for the transfer of freight from one track to another, but which it did not need, and some of the plank and other material of which it wanted to use elsewhere.

It was an open shed, about 120 feet in length, supported by 8x10 oak posts, running through the center, and extending from the roof down through and below the floor or platform, where they were framed into sleepers or timbers lying crosswise upon the ground. The floor was about 4 feet above the ground, and constructed of thick oak plank, resting upon joists supported by stilts or piling. The posts running through the center and supporting the entire weight of the structure were about 15 feet apart, extending along the center line of the roof and platform. Along and on the tops of these posts extended 4x6 pine plates or timbers, constituting a center plate, and near the tops of the posts, and fastened to them, were caps or cross-arm pieces 12 feet long, and on the ends of these were fastened smaller plates, and on the center and side plates rafters were laid and fastened 2 feet apart, and on this frame work rested the roof, sloping both ways from the center, made of 7-8 inch cypress boards, covered with tar paper and a coating of gravel, making the roof in all about $1\frac{1}{2}$ inches in thickness. The shed was wholly open both at the sides and ends, and rested with its entire weight upon the posts extending through the center.

It appears from the evidence that Scullen's plan was to take down the north portion, or about 60 to 70 feet in length of this shed, by sawing the roof in two, cutting some of the braces, and chopping with axes the supporting posts above the platform, and then, at the proper moment, by means of shores, to push the building over to one side. To this end, as soon as the men were on the ground, he set them at work to accomplish this purpose. Some were directed to chop the posts, some to saw the braces, and still others to saw the roof in two. The plaintiff, Brown, was at once directed by Scullen to go upon the roof, and to saw it in two, which he did. After a little time, Charles Mahon was sent up to assist him. Brown says he did all the sawing with a crosscut saw until the roof was sawed in two; that he used an iron crow or pinch-

bar to tear the paper and gravel up, so that he could saw the roof. He testifies—and there is nothing to contradict his statement—that he had never seen the shed before; that he was wholly new to that business, having been a farmer previously, and sometimes working on a steamboat; that he knew nothing of what Scullen's plan was for taking down the shed, but simply obeyed Scullen's orders, as did the other men; and there is similar testimony by the other witnesses; that he (Brown) was the first to go on the roof, and the last to come down; that, when he had finished the sawing, he came down, and found Scullen and the other men outside the shed; that when he was on the roof he could hear nothing and see nothing of what had been done or what was going on below; that when he came down, and got within 10 feet of where Scullen and Charley Mahon were standing, Scullen told Mahon to cut the post; that, upon Mahon replying that "he was no good with an axe," Scullen told him (Brown) to "get the axe, and cut a little more on this side;" that he then took the axe, and struck a few blows, when the shed fell and caught him; that, while he was doing the chopping, Scullen was near by, outside on the railroad track, east of the shed, where he and the other men had a plank which they were using as a shore or brace, having one end against the railroad track and the other against the shed; that the post which he chopped had been cut before on both sides; and that he gave it three or four blows, when the shed fell, but does not think he cut it off, but thinks that it broke off.

It is in evidence that the post which the plaintiff chopped came down when the shed fell, and broke through the plank platform, and that Brown was caught and doubled up with his breast on his knees for some time before the men were able to get him out, and that he was badly injured, and became paralytic.

One point counsel for plaintiff in error make is that the damages are excessive, but this contention was not pressed on the hearing, and the court is of opinion that there is little support or countenance for it in the evidence.

There is not much conflict in the testimony, and no dispute about the leading facts. The only machinery, tools, or appliances furnished by the company, or used by Scullen in taking down the building, was a crosscut saw, four axes, one crow, one pinchbar, hammers, a maul, and two pieces of old plank, picked up in the vicinity for the occasion, and which the evidence tends to show were unsound and partially rotten.

The contention of the plaintiff in error is that there was no negligence shown on the part of the company; that, allowing Scullen to have been guilty of negligence, his negligence, he being a fellow workman with Brown, is not chargeable to the company; and that the negligence of Brown contributed to produce the injury. The court is of the opinion that no branch or portion of this contention can be sustained as a matter of law; and the court cannot review the case upon the facts, except to see that the verdict is not unsupported by the testimony.

The jury were clearly justified in finding that Patrick Scullen was guilty of negligence in trying to take down the shed in the manner adopted, without other and better implements and appliances for such a work; and we think the circuit judge properly ruled that, under the facts as they appeared from the testimony, Scullen, as foreman for the purpose of that work, stood in the place of the company, and was not merely a fellow servant with Brown. That is according to the law in Illinois, as settled by the highest court in that state in several adjudged cases. See Railroad Co. v. May, 108 Ill. 298; Railway Co. v. Hawk, 121 Ill. 263, 12 N. E. Rep. 253; Coal Co. v. Wombacher, 134 Ill. 57, 24 N. E. Rep. 627. And the doctrine of these cases is substantially that of the United States supreme court in Railway Co. v. Ross, 112 U. S. 377, 5 Sup. Ct. Rep. 184, which we think controls this case. This is in accordance also with the rule adopted in the United States circuit court and circuit courts of appeal, and the weight of authority generally in this country. Woods v. Lindvall, 1 C. C. A. 37, 48 Fed. Rep. 62; Borgman v. Railway Co., 41 Fed. Rep. 667. If, then, Scullen stood for the company, it follows that the company is responsible for his negligence, if the accident was caused by it, unless the negligence of Brown contributed. The jury were justified by the evidence in finding, as they must have found, that Scullen, in planning to take down the shed in the manner indicated, with the meager tools and limited appliances employed, was guilty of negligence in exposing the men under him to such unnecessary hazard.

Perhaps some labor and expense could be saved by taking the shed down by sawing the roof, and sawing and chopping the braces and posts, and pushing the shed over, provided suitable care had been taken in supplying machinery and appliances for the purpose and in the execution of the work. But here was a heavy and unwieldy structure, 60 to 70 feet in length, and the plan was to cut away the support, and, at the proper moment of weakening, to push the building over; and the only means used for the purpose were these few tools and the two pieces of plank for shores. No doubt, the jury believed there should have been, if not more men, at least more and better timbers to be used as temporary support for the roof through the center, so that, when the posts were cut, there would be something to prevent the building from falling, as it did fall, while they were trying to push it over, and some others to use for shores at different points on the side. The evidence shows also that the wind was blowing at the time in a direction opposite to the one in which the shed was to be pushed over, which no doubt complicated the situation, and rendered care and caution all the more necessary. The entire scheme and the direction for its execution were those of Scullen. The evidence shows that neither Brown nor the other men knew anything about them, except as the work proceeded, or had anything to do but to obey Scullen's orders. The roof might have been sawed asunder on a diagonal instead of straight line, in such way as to prevent its falling or being blown over in the wrong direction; and other obvious precautions might and should have been

employed by Scullen to guard against the accident which happened, and which he ought to have apprehended.

The question of contributory negligence was properly submitted to the jury, and we have no power or wish to disturb the finding. Indeed, we think it fairly supported by the evidence. Brown had done the work assigned to him. While sawing the roof he had no opportunity of knowing what had been done below; at least, he so testifies, and there is no evidence to the contrary. He did not know what braces or posts had been chopped, and had no reason to suppose that his cutting one of the several posts, as directed by Scullen, would cause the structure to fall. Scullen should have known of that danger, and provided against it. He was in a safe place himself, but he sent Brown to a point of great danger, in circumstances where a skillful and prudent man would have done otherwise. He says he told Brown to cut the post a little, and Brown says he cut it a little; just how much does not appear, or whether he cut it off. He testifies that he does not recollect about seeing the post come in two, for three or four inches were holding; that he struck three or four blows, and the shed caught him; that he does not know whether the post broke off or not, but that he knows he never chopped it in two, for there was too much wood for the three or four blows he gave it to cut it in two,—too much timber left. Nor does it appear with any certainty how much the other posts had been cut. Witness Charles Mahon, who came from the roof before Brown, says they were all chopped, more or less; that some had been chopped in halves, others about two-thirds, as near as he could remember. He also says the wind was blowing in the opposite direction, and they did not have men enough there to use the plank, as he says could be very easily seen, as the biggest part of the shed fell on the opposite side of what it was intended to fall. How it was expected, without rope or windlass or other means than those provided, and with five or six 8x10 dry oak posts but partly cut, to push the shed over in safety, it is difficult to perceive. Scullen stood but a few feet from Brown when he was doing the cutting, without giving any orders to stop. He was presumably directing and controlling the cutting from first to last, and the jury were clearly justified in finding that everything done by Brown was done under Scullen's authority and direction, in ignorance of the danger which Scullen ought to have recognized.

The judgment of the circuit court is affirmed, with costs.